January D. Allen (7-5723)
Daniel M. Reilly (*pro hac vice forthcoming*)
John M. McHugh (*pro hac vice forthcoming*)
Amy L. Jones (*pro hac vice forthcoming*)
FENNEMORE CRAIG, P.C.
3615 Delgany Street, Suite 1100
Denver, Colorado 80216
Telephone: (303) 291-3200
Facsimile: (303) 291-3201
jallen@fennemorelaw.com
dreilly@fennemorelaw.com
jmchugh@fennemorelaw.com
ajones@fennemorelaw.com

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**

JOE RICKETTS, HUGO ENTERPRISES, LLC, RIPARIAN LANDS, LLC, RIPARIAN LANDS II, LLC, RIPARIAN LANDS III, LLC, and RIPARIAN LANDS IV, LLC

Plaintiffs,

-vs-

MORGAN FISCHER, LONG ISLAND BUYERS REALTY LLC, DAN SCHWAB, DEADMAN RANCH, LLC, and GREYS RIVER MEADOWS, LLC

Defendants.

Civil Action No:

---

**COMPLAINT AND JURY DEMAND**

---

Joe Ricketts ("Ricketts"), Hugo Enterprises, LLC ("Hugo Enterprises"), Riparian Lands, LLC, Riparian Lands II, LLC, Riparian Lands III, LLC and Riparian Lands IV, LLC (the four Riparian Lands entities are collectively called the "Riparian Land Subsidiaries") bring this

complaint for damages against Defendants Morgan Fischer ("Fischer"), Long Island Buyers Realty LLC ("Long Island Buyers Realty"), Dan Schwab ("Schwab"), Deadman Ranch, LLC ("Deadman Ranch") and Greys River Meadows LLC ("Greys River Meadows") for violations of the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1703(a)(2), Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968, and state law causes of action under the laws of the State of Wyoming.

**INTRODUCTION**

1. In 2017, the U.S. Forest Service valued an undevelopable parcel of Wyoming land, accessible only by boat or helicopter, at approximately $90,000. Less than five years later, in January 2022, Defendant Fischer, Plaintiffs' long-time trusted real estate advisor, and Defendant Schwab fraudulently induced Ricketts to purchase that same property for the grossly inflated price of $2.9 million, more than thirty-two times its prior valuation. This overpayment was not an isolated mistake. It was the opening payout in a four-transaction scheme in which Fischer and Schwab defrauded Ricketts out of $33.579 million by getting him to pay $55.65 million for Wyoming real estate later independently determined to be worth approximately $22.071 million.

2. The scheme paired two financially desperate men, each burdened by substantial debt and each seeking to financially exploit Ricketts for his own personal gain. Defendant Schwab, who previously served a federal sentence for fraud and against whom a bank was then pursuing a legal judgment for $1.2 million, controlled multiple stagnant properties encumbered by major debt and co-owned with increasingly disgruntled business partners. Defendant Fischer controlled something even more valuable: Ricketts's trust and confidence. And like Schwab, Fischer was in financial distress with multiple legal judgments piling up against him and his mortgage lender pursuing foreclosure proceedings against his home.

3. Before Defendant Fischer met Defendant Schwab, Ricketts had authorized Fischer to act as his agent to find land, select and vet the appraisers, negotiate the contracts, and purchase the properties at their appraised values—all in service of Ricketts's decades-long dream of restoring a portion of land near his Wyoming property through a Forest Service land swap. Fischer was thus well-positioned to work both sides of any land deal—seemingly serving the buyer (Ricketts) while he actually in bad faith advanced the objectives of the seller (Defendant Schwab) from inside the buyer's team.

4. Each man supplied what the other lacked. Defendant Schwab could in bad faith manufacture paper value for the land by controlling the seller entities, feeding appraisers false assumptions and insider transactions disguised to look arm's length, and sequencing the transactions to maximize Defendants' personal enrichment. Defendant Fischer could in bad faith deliver the buyer by suppressing contrary advice, selecting pliable appraisers, withholding information that could have alerted Ricketts to the fraud, promising a viable land swap, and falsely describing contractual protections. Schwab would receive and selectively parcel out the payouts for heavily indebted, and in some cases undevelopable, land. And, for his double-dealing, Fischer received substantial under-the-table kickback payments from Schwab. Their method was premeditated and deceitful: agree upon and set the selling price first, make sure the appraisal supported it, conceal the exaggerated appraisal's defects, obtain Ricketts's assent and signature, and then share the ill-gotten gains.

5. The first transaction Defendants established their playbook; the second and third scaled it; and, in the last, Defendants swung for the fences, maximizing Schwab's and Fischer's illicit windfall. Each transaction laundered the grossly exaggerated prices through a rigged

appraisal process, which Defendant Fischer then recommended to Ricketts, securing Ricketts's consent through fraud.

6. The Defendants' conduct violated two federal statutes and multiple legal obligations found in Wyoming common law, including the highest duty in law—fiduciary duty. This suit is intended to recoup all of the losses incurred by the Plaintiffs, disgorge Defendants' ill-gotten gains, and to deter others from engaging in similar misconduct.

**PARTIES, JURISDICTION AND VENUE**

7. Plaintiff Joe Ricketts is an eighty-four-year-old husband, father, grandfather, philanthropist, and entrepreneur. Ricketts is the founder and former CEO and chairman of the online brokerage firm TD Ameritrade. Ricketts is a resident of Sublette County, Wyoming, and he is the 100% beneficial owner of Hugo Enterprises. Ricketts owns a ranch along the Hoback River and has long hoped to restore a portion of the river near his property.

8. Plaintiff Hugo Enterprises is a holding company and sole member of the Riparian Land Subsidiaries that participated in each of the subject transactions (the "Riparian Transactions").

9. Plaintiffs' Riparian Land Subsidiaries are the following single-purpose entities: Riparian Lands, LLC; Riparian Lands II, LLC; Riparian Lands III, LLC; and Riparian Lands IV, LLC. Riparian Lands, LLC, is a Delaware-based LLC. The remaining three Riparian Land Subsidiaries are Wyoming-based LLCs. The Riparian Land Subsidiaries were the purchasers of record in the Riparian Transactions, hold title to the Riparian Land, and were directly injured in their business and property by the conduct alleged herein.

10. Plaintiffs directly, or through others acting on their behalf, paid the purchase prices for the Riparian Land.

11. Ricketts was also directly and personally injured, including through his personal guarantees of the promissory notes assumed in the Riparian Transactions.

12. Ricketts and Hugo Enterprises were further damaged by the compensation, bonuses, and expenses paid to Fischer.

13. Defendant Morgan Fischer is a New York resident and a real estate consultant who was retained by Plaintiffs.

14. Defendant Long Island Buyers Realty LLC is a New York limited liability company. Upon information and belief, Fischer is or was the sole member of Long Island Buyers Realty LLC. Defendant Fischer acted, at least partially during the relevant time frame, on behalf of Long Island Buyers Realty LLC, and Long Island Buyers Realty LLC is thereby responsible for some or all of Defendant Fischer's misconduct.

15. Defendant Dan Schwab is a Wyoming resident and a land developer and seller who was directly involved in the Riparian Transactions. Schwab acted as the agent (and was a member and/or manager) for Deadman Ranch and Greys River Meadows.

16. Defendant Deadman Ranch, LLC is a Wyoming limited liability company and was the developer for The Point and the co-developer for the Renegade subdivision (collectively, the "Subdivisions"). Deadman Ranch was the seller for two of the Riparian Transactions. Defendant Schwab acted, at least partially during the relevant time frame, on behalf of Defendant Deadman Ranch, LLC, and Defendant Deadman Ranch, LLC is thereby responsible for some or all of Defendant Schwab's misconduct.

17. Defendant Greys River Meadows, LLC is a Wyoming limited liability company and was the co-developer for The Renegade subdivision. Greys River Meadows was the seller for one of the Riparian Transactions. Defendant Schwab acted, at least partially during the

relevant time frame, on behalf of Defendant Greys River Meadows, LLC, and Defendant Greys River Meadows, LLC is thereby responsible for some or all of Defendant Schwab's misconduct.

18. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1719, as federal questions are presented by Plaintiffs' claims under the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1701, *et seq.*, and the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961, *et seq*. Supplemental jurisdiction over the accompanying state law claims is proper under 28 U.S.C. § 1367, as those claims arise under a common nucleus of operative facts.

19. This Court has personal jurisdiction over the parties, as Schwab is a Wyoming resident. Fed. R. Civ. P. 4(k). In addition, because Schwab resides in Wyoming, this Court also has personal jurisdiction over Schwab pursuant to 18 U.S.C. § 1965, where, as here, the ends of justice so require. This Court also has personal jurisdiction over Defendants as the acts complained of occurred within this District and arose out of Defendants' transaction of business in, and contacts with and purposeful availment of the forum, affording the Court specific personal jurisdiction over Defendants consistent with Wyoming's long-arm statute. Wyo. Stat. Ann. § 5-1-107.

20. Venue is proper in this District under 28 U.S.C. § 1391(b) as the matters giving rise to this action occurred in the District, and the property at issue is located within this District.

## THE PROPERTIES SCHWAB NEEDED TO OFFLOAD

21. The Riparian Land is comprised of parcels in two subdivisions, "The Point" and "Renegade."

22. The Point is unimproved real property comprised of seven lots, totaling 5.69 acres, located near the confluence of the Snake River and Greys River in Lincoln County, Wyoming. It is entirely surrounded by Bureau of Land Management property. The Point is only

accessible by helicopter or boat. Deadman Ranch owned The Point at the time of the Riparian Transactions.

23. Renegade is a subdivision of approximately 95 acres located along the Greys River in Lincoln County, Wyoming. The master development plan for the subdivision is approved for up to 40 lots. It is surrounded by U.S. Forest Service ("Forest Service") lands, specifically the Bridger-Teton National Forest.

24. The Schwab-controlled entities, Defendant Deadman Ranch and Defendant Greys River Meadows, began acquiring the property that would become the Renegade subdivision in 2012 and commenced the entitlements process as its developers by 2015. All Renegade lots (with the exception of lots they had transferred to insiders or via other non-arm's length transactions) were owned by the developers, Deadman Ranch and Greys River Meadows, at the time of the Riparian Transactions.

25. Upon information and belief, Defendant Schwab, on behalf of Deadman Ranch and/or Greys River Meadows, had previously engaged in marketing efforts to sell both The Point and Renegade as a collective offering to prospective purchasers.

26. As of the time of the Riparian Transactions there had been numerous insider transactions involving the subject properties, but no lot in the Subdivisions had ever been the subject of a true arm's length transaction for fair market value since the land was purchased by the developers. Instead, lots had been sold to insiders or in atypical transactions, including: (a) transfers of four different Renegade lots (21, 22, 24, and 25) back and forth between the developers and a lender in exchange for various loans and promises of exclusive commercial rights within the subdivision; (b) the exchange of Lot 23 in Renegade for The Point and one of

Schwab's old debts; and (c) a transaction on Lot 2 that was effectively a purchase of the property for $1.3 million to the developers but was incorrectly characterized as a 'sale' for $3.2 million.

27. Upon information and belief, not only were the insider and atypical nature of these transactions concealed from prospective purchasers, but they were intentionally misrepresented by the developers for the purpose of inducing potential purchasers to believe the Riparian Land had a greater value. Artificially inflated 'purchase prices' of non-arm's length sales, such as Lot 2, were listed in the marketing brochures for Renegade, while those with significantly lower 'purchase prices' were intentionally omitted from marketing materials.

28. Upon information and belief, by the time of the Riparian Transactions, Schwab, Deadman Ranch, Greys River Meadows, and their respective members were heavily indebted to others. All told, entities affiliated with or controlled by Defendant Schwab have been involved in at least twelve mortgages related to these properties since 2013, totaling a debt burden of $10,516,990. Upon information and belief, it was these debts and looming related legal issues with disgruntled business partners that drove Schwab's participation in the conspiracy with Fischer to defraud Plaintiffs into grossly overpaying for the four Riparian Transactions.

## BY THE TIME SCHWAB FIRST CONTACTED FISCHER, FISCHER HAD GAINED RICKETTS'S TRUST AND CONFIDENCE

29. In 2018, Morgan Fischer began working as a real estate and construction consultant for Hugo Enterprises under an agreement between Fischer's company, Long Island Buyers Realty, and Hugo Enterprises.

30. At first, Fischer was only consulted on small one-off projects. After some initial success, Fischer was assigned by Ricketts to oversee and coordinate an increasing number of projects with greater importance and dollar value. Upon information and belief, by 2019, Fischer's full-time or nearly full-time efforts were devoted to his work on Plaintiffs' projects.

31. Over time, Fischer developed a close working relationship with Ricketts. He was regularly flown for in-person meetings with Ricketts to discuss various projects and proposals. Fischer was afforded an increasing degree of autonomy and discretion, and by 2020, Fischer had full authority to act on Ricketts's and Hugo Enterprises's behalf in negotiations and discussions with officials at building, planning and other county agencies on certain projects.

32. Fischer received compensation of $25,000 per month for his services (totaling more than $2.4 million by the time of the Riparian Transactions), including two bonuses of $100,000 each during the period of the Riparian Transactions. Fischer was also reimbursed for all of his out-of-pocket expenses, which included thousands of dollars for first-class airline tickets annually and client and business entertainment expenses.

33. For decades, Ricketts had hoped to restore a section of the Hoback River that runs through his ranch. To achieve that goal, Ricketts would first have to secure adjacent lands belonging to the Forest Service.

34. One way for a private citizen to acquire land owned by the Forest Service is through a land exchange or a land swap. If a private party owns land that has a public benefit to it and the Forest Service wishes to acquire that land, that private party can enter into an agreement with the Forest Service that allows the private party to exchange its land for the federal land, provided they are of *equal value*. Locating the property that would enable him to pursue such a land swap had long been one of Ricketts's prioritized projects.

35. By May 2020, Ricketts fully trusted Fischer and asked him to develop a strategy for a federal land exchange and to locate and acquire land suitable to accomplish a land swap. Fischer was given authority to engage other consultants and to direct others representing Ricketts

or Hugo Enterprises, including lawyers. In most instances, Fischer was Ricketts's primary point of contact and communication on the project.

36. After years of Fischer building Ricketts's trust, Ricketts took at face-value the information and summaries Fischer, his agent and confidant, provided.

37. Because any land proposed for a land swap must be of at least "equal fair market value" to the fair market value of the land Ricketts hoped to receive from the Forest Service, an accurate and fair appraisal of the value of the property was critical. Upon information and belief, Fischer knew that such valuations would ultimately have to be a "Yellow Book appraisal," which means the valuation must follow the Uniform Appraisal Standards for Federal Land Acquisition.

**DEFENDANTS' SCHEME TO DEFRAUD PLAINTIFFS INTO OVERPAYING FOR PROPERTY**

38. Unbeknownst to Ricketts, Defendant Fischer was experiencing significant financial pressures. In 2019, a foreclosure proceeding had been initiated against Fischer's home and a law firm obtained a judgment against Fischer for approximately $120,000 for unpaid legal bills. Later, in May 2021, a second law firm sued Fischer in New York state court for approximately $25,000 in unpaid legal bills.

39. Upon information and belief, in late 2020 Fischer was desperate for a solution to his money problems and saw his relationship with Ricketts as a potential source of financial exploitation. Upon information and belief, Defendant Fischer determined that the land he was tasked with acquiring for the potential federal land swap could serve as the basis to defraud Ricketts. Defendant Fischer began the process of getting the word out in the Western Wyoming real estate market that Ricketts was interested in a land swap. In his desperation to relieve his financial strain, he found a willing partner in Dan Schwab.

40. In mid-November 2020, Fischer received a self-described “unsolicited call” from a real estate agent who indicated that he represented Defendant Schwab. During the call, Schwab’s agent promoted properties in both The Point and Renegade as capable of meeting Ricketts’s land swap needs. Fischer reported to Ricketts that the real estate agent told him “the [F]orest [S]ervice would do back flips” to acquire the property, and that the Forest Service had been “salivating” about this property. Per Fischer, he was also informed by the real estate agent that Defendant Schwab already had an inside contact at the Forest Service.

41. Unbeknownst to Plaintiffs, based on historic Multiple Listing Service (“MLS”) listings, that same agent had been the listing agent on prior attempts to sell lots at both The Point and Renegade since at least 2019, with his listing descriptions for The Point specifically stating that prospective purchasers may want to “investigate a land swap with the [F]orest [S]ervice.” In fact, historic MLS listings for The Point going back to at least 2014 had advertised the property’s potential suitability for a land swap. Yet, no sale to a prospective purchaser interested in a land swap had occurred.

42. Upon information and belief, in 2017 the Forest Service had offered to buy The Point for $90,000. Upon information and belief, that valuation was based on nearby real estate prices with a substantial reduction due to the lack of access to The Point. Upon information and belief, Schwab was involved in discussions with the Forest Service at that time and was aware of the low value the Forest Service placed on The Point.

43. Like Defendant Fischer, Defendant Schwab also had a desperate need for a transaction to occur. On November 12, 2020, right around the same time that Schwab’s real estate agent contacted Fischer, a $1.2 million judgment against Dan and Kristi Schwab was renewed by the Bank of Commerce. And upon information and belief, Schwab and his business

partner, Michael Call, had also incurred significant debt through a separate failed fishing resort development.

44. Upon information and belief, by late 2020, Defendant Schwab and his related entities had also amassed significant debt related to The Point and Renegade.

45. Upon information and belief, Defendant Schwab's relationship with his business partners had become strained, largely due to financial disputes and indebtedness. In particular, Schwab's relationships with his business partner in Greys River Meadows, Michael Call, and his business partner in Deadman Ranch LLC, Boyd Jacobson, had soured. Defendant Schwab and Call made an arrangement to divide up the properties at Renegade, with Call being allocated properties of higher value, which was intended to relieve Schwab of the pressure Call was imposing in light of the oppressive debt on the stagnant property.

46. Shortly after his "unsolicited" call from Schwab's real estate agent, Defendant Fischer began making travel plans to meet with Defendant Schwab. On or about November 29, 2020, Fischer flew first class to Wyoming and stayed in Wyoming until December 7.

47. On December 3, 2020, Defendant Schwab flew Defendant Fischer in his private plane to the Renegade property in Afton, Wyoming. During the flight, Schwab allowed Fischer to fly his plane even though Fischer was not a licensed pilot. Defendant Fischer reported to Ricketts that on that tour he "flew to Renegade with Dan Schwab and enjoyed the complete tour of the Renegade property as well as several hours of conversation, both of a personal nature and around the possibility of utilizing The Point and Renegade properties in your land swap strategy." Following this tour of Renegade, Defendants Schwab and Fischer spent the next several days with one another.

48. On the following day, Friday, December 4, 2020, Fischer drove to Defendant Schwab's office in Afton, Wyoming, for an in-person meeting, where the two conducted a video conference with Defendant Schwab's contact at the Forest Service, along with another Forest Service representative. The meeting was also attended by Michael Schrotz, the land consultant Fischer had been directed to utilize on Plaintiffs' land swap project.

49. Upon information and belief, in that meeting Schrotz told Defendant Fischer "that I would not buy [the properties Fischer targeted] and would advise you not to buy them." Upon information and belief, Schrotz's advice was based, in part, on his knowledge of the 2017 discussions with the Forest Service about purchasing The Point and the low value assigned to it by the Forest Service.

50. Defendant Fischer, however, never conveyed Schrotz's counsel to Ricketts. Instead, Defendant Fischer pressed on with his planned land exchange strategy and actively concealed Schrotz's advice from Plaintiffs, reporting instead in his December 2020 report sent to Ricketts on December 16, 2020, that "this was a fantastic meeting."

51. Defendants Fischer and Schwab continued their long weekend of scheming, when Fischer invited Schwab to Ricketts's ranch for an event sponsored by Ricketts on December 5, 2020. Upon information and belief, the purpose of inviting Schwab was to introduce him to Ricketts and to attempt to ingratiate Schwab with Ricketts.

52. At the conclusion of their multiple days together, Defendant Fischer reported to Ricketts in a December 15, 2020 email: "I find Dan [Schwab] to be very knowledgeable as well as an out of the box thinker and I believe I can work well with him. I believe he is a man of character…."

53. Upon information and belief, it was in this timeframe that Defendants Fischer and Schwab developed their intricate scheme to capitalize on Plaintiffs' interest in a land swap and Plaintiffs' trust and confidence in Fischer. Defendant Fischer assured Defendant Schwab he could deliver Plaintiffs' agreement to purchase the subject land at the price he and Schwab agreed to. Defendant Fischer informed and assured Defendant Schwab that all he would need to get Ricketts's agreement to their exaggerated sales price was an appraisal. Defendant Fischer and Defendant Schwab could then cause Plaintiffs to purchase the Riparian Land at a pre-determined value grossly in excess of market value. Defendants Schwab and Fischer exploited the trust and confidence Fischer had attained from the Plaintiffs. To do so, Schwab and Fischer planned and orchestrated a sequential series of transactions calculated to eliminate various Schwab pre-existing debts and disputes, and to maximize both of their personal and financial gains.

54. To give Ricketts comfort about the job Defendant Fischer was doing for Ricketts, on December 12, 2020, Defendant Fischer emailed Ricketts that: (1) he would "thoroughly view and vet all the appraisals"; (2) he was negotiating the Riparian Transactions "in such a way to limit [Plaintiffs'] exposure and cash layout"; (3) the Riparian properties would revert back to seller at Plaintiffs' election if the land swap did not come to fruition; and (4) he was structuring the Riparian Transactions to put Plaintiffs "in the best financial position."

**DEFENDANTS STRUCTURE FRAUDULENT TRANSACTIONS FOR THEIR PERSONAL BENEFIT**

55. Upon information and belief, and unbeknownst to Plaintiffs, Defendants Schwab and Fischer had intentionally plotted to break the sale of the properties into multiple transactions, and sequence those transactions in order to serve numerous objectives, including: (i) paying off various long-standing debts on various properties or to business partners and affiliates; (ii) facilitating sales of other properties by business partners or affiliates who had grown

dissatisfied with the failed development and inability to sell; (iii) getting other business partners "out of the way"; and (iv) maximizing the financial benefit to Defendants over any of the other sellers of the Renegade lots.

56. In the first of the series of real estate transactions in Defendants' scheme ("Riparian I"), Deadman Ranch conveyed The Point and two of the lots at Renegade owned by Deadman Ranch (Lot 28 and Open Space North), to Riparian Lands, LLC. The purchase price was $6.4 million, comprised of $2.9 million in cash and the remainder in assumption of various pre-existing debts which Deadman Ranch, Greys River Meadows, TerraWest Conservancy, Inc. (a Schwab-owned company), and/or Schwab owed to lenders. The purchase price was allocated $2.9 million to The Point, $1.5 million to Open Space North, and $2 million to Lot 28.

57. Notably, the prospective prices that Defendant Fischer suggested to Ricketts in December 2020 (prior to any appraisals taking place) are very close to what the allocated purchase price amounts ended up being in the Riparian Transactions. In his December 16, 2020 monthly report to Ricketts, Fischer suggested that the purchase price for The Point might be "approximately $3M[.]" In the Riparian I transaction, the purchase price allocated to The Point was $2.9 million. In his December 16, 2020 monthly report to Ricketts, Fischer had the following forecast of the purchase price for the southern lots at Renegade: "my gut says it would be just north of $20M[.]" In the second transaction ("Riparian II"), the purchase price for the property ended up being $22.7 million. Upon information and belief, Fischer's "gut" projections of purchase prices were instead based on prices he and Schwab had conspired to fix or set from the outset.

## I. **Defendants orchestrate an inflated price to accomplish their financial goals and manipulate appraisals to that end.**

### *a. Schwab handpicks a biased appraiser to secure their inflated price.*

58. Ricketts required Fischer to obtain formal appraisals to establish the fair market value of the properties Fischer was recommending Ricketts purchase and, thus, Defendants' scheme depended upon an appraisal justifying their inflated prices. To accomplish that goal, upon information and belief, Schwab selected a Bedford, Wyoming appraiser, Randall Smith. Fischer did no due diligence on Smith and retained Smith without consulting Ricketts. Fischer did not tell Ricketts that he was retaining an appraiser recommended by Schwab or that he had done so without any further due diligence. Instead, on March 19, 2021, Fischer reported that he had already "commissioned" an appraiser to "appraise the Alpine Point property, as well as the Renegade properties," in order to "right size the trade."

59. Upon information and belief, Smith was not qualified to conduct a complex appraisal, let alone the required Yellow Book appraisals. Fischer did not vet Smith's qualifications. Nor was Smith ever asked to perform a Yellow Book appraisal, as would have been necessary to truly 'right size the trade' for a federal land swap.

### *b. The appraiser is assigned to value irrelevant properties in order to camouflage the valuations and for Schwab's personal purposes.*

60. Based on Fischer's representations, Plaintiffs believed that Smith was being retained to provide an independent fair market value appraisal of the specific properties that were being acquired in the Riparian I transaction.

61. However, unbeknownst to Plaintiffs, Defendants had provided a different scope of work to Smith, involving lots that were not involved in the Riparian I transaction.

62. For example, Smith's Renegade appraisals included Lots 22, 23 and 27, none of which were part of the Riparian I transaction.

63. Although it was Ricketts who paid for the Smith appraisals and was supposed to be the client, it was Defendant Schwab who directed Smith to appraise Lots 22, 23, and 27 to serve his own purposes of providing background assurances to lenders or business partners, and to influence and steer later appraisals, negotiations, and sales.

64. Upon information and belief, Defendant Schwab had previously utilized Smith to serve such objectives.

*c.* _*Defendants manipulate the appraisal process by feeding the appraiser specific prices and pre-selected comparables for the properties.*_

65. Upon information and belief, Schwab and Fischer directed Smith to reach specific value ranges for each of the lots he appraised in order to serve their personal and financial objectives.

66. Smith's appraisal of the lots at The Point totaled $3.045 million. Notably, this is more than double the highest previous unsuccessful listing price of The Point. This figure was also just a smidge above what Defendant Schwab would allocate of the Riparian I purchase price to The Point ($2.9 million) and was a figure sufficient to cover Defendant Schwab's prior indebtedness to lenders on The Point ($2.25 million).

67. Upon information and belief, Defendant Schwab directed Smith to utilize specific comparables—comparables Defendant Schwab knew did not represent fair market value—for the purpose of skewing the appraisals.

68. In order to use some of the comparables identified by Schwab, Smith made the extraordinary assumptions that The Point was accessible by a bridge, already had roads and could be properly platted and approved for residential development. Fischer and Schwab knew that those assumptions were false.

69. But that false assumption allowed Smith to justify, at Schwab's insistence, the use of residential subdivision properties from the affluent city of Alpine, WY as "comparables."

**The Point:**



**"Comparable" properties appraiser used to value the Point:**




70. Smith also heavily relied upon Lots 2 and 23 as comparables in his Renegade appraisals. However, both were insider or non-arm's length transactions, and both involved transactions where a significant portion of the 'purchase price' was not cash but instead illusory promissory notes, an exchange for some other property, and/or debt forgiveness of the seller (Schwab).

71. Lot 2, represented by Schwab to have a previous sale price of $3.2 million, was actually a non-arm's length transaction, and only up to $1.3 million changed hands. The remainder of the "sale price" was evidenced by a promissory note that contained terms wherein no payment would be due unless and until a detailed series of criteria were met. The face value of the note was also subject to reduction even if the note should come to maturity. As a result of these terms, there was a very low probability that any payment would ever become due on the note. This atypical transaction was specifically designed by Schwab in order to create the false impression of higher value for properties in Renegade.

72. Lot 23, represented by Schwab to have a previous sale price of $2,622,457, was in actuality an “exchange agreement” wherein Schwab’s friend and lender, Charles Burnham, acquired Lot 23, and transferred The Point back[1] to a Schwab-affiliated entity, with no money changing hands. In this transaction, the parties assigned a value of $2 million, and, upon information and belief, an old debt Schwab owed to Burnham that with accrued interest was $622,457 at the time of the transaction.

73. Additionally, Smith, at the direction of Schwab, relied on “additional comparables” that were limited to listings, not actual sales, of lots within Renegade, each of which Schwab had just recently put on the MLS. With respect to at least one of the lots, the appraisal value Smith reached was identical to the purchase price Deadman Ranch and/or Schwab had been seeking in their MLS listings just a few months earlier.

*d.* *__The Open Space fraud.__*

74. Smith appraised Open Space North at $2.5 million, making the purchase price allocation of $1.5 million look like a steal, except that Smith’s valuation was based on a false premise. Open Space North was subject to development restrictions per the approved plat, yet Smith had valued it as if it were capable of being developed as a residential lot. Smith, upon information and belief at the direction of Defendants, failed to mention that Open Space North is the location for sewer/septic outfall for the lots at Renegade, and also has water lines for the lots running under it.

---

[1] A Schwab-affiliated entity had deeded The Point to Burnham’s holding company back in 2007. Despite multiple prolonged listings during his decade-plus of ownership, Burnham was unable to sell The Point. Upon information and belief, the “exchange” transaction in April 2020 was a result of Burnham’s growing dissatisfaction with the representations Schwab had made to induce him to acquire The Point in the first instance, and Burnham’s demands to be repaid sums Schwab owed him.

75. Because of the development restrictions and the location of sewer/septic outfalls and water lines, Open Space North cannot be developed as a residential lot. As the developer, Schwab and Deadman Ranch knew of these limitations but instructed Smith to appraise the lot as if it could be developed as a residential lot in order to inflate its value.

*e.* *Fischer intentionally withholds portions of the appraisal to hide Defendants' fraud.*

76. It was not until three months after Fischer received the Smith appraisals that Fischer provided any portion of those appraisals to Ricketts. Upon information and belief, this delay was part of the scheme and intended to minimize Ricketts's scrutiny.

77. And when Defendant Fischer emailed portions of the appraisals to Ricketts on May 26, 2021, Fischer intentionally edited the contents of the Smith appraisals to serve the objectives of Fischer and Schwab's scheme. Fischer sent only the top sheets and photos from the appraisals, along with his editorial comment that the combined total of the appraisals was higher than the purchase price Plaintiffs were to pay in the Riparian I transaction.

78. Upon information and belief, Fischer intentionally omitted pages related to extraordinary assumptions and comparables, effectively eliminating any information that could have provided notice to Ricketts of the fundamental flaws in and unreliability of Smith's work.

79. Defendant Fischer further mischaracterized the appraisal excerpts when transmitting them to Ricketts on May 26, 2021, totaling them (including the appraised values on the three lots that were not part of the transaction), and stating: "as you can see from the various appraisals, we have an inventory of just more than $16 million worth of property available for you to trade with the Forest Service for the Riperian (*sic*) Trade."

## II. <u>Defendants structure the Riparian I transaction to benefit themselves at the expense of Plaintiffs.</u>

80. The Riparian I transaction closed on January 28, 2022. The negotiations and structuring of the transaction leading up to that point further evidence the Defendants' conspiracy and misconduct.

81. On May 26, 2021, Defendant Fischer emailed Plaintiffs selected portions of the Smith appraisals on all of the Renegade lots (outlined in red in the map below). In that email, Defendant Fischer provided the following additional reassurance to Ricketts: "I will thoroughly view and vet all the appraisals and pick out a strategy for which ones to include in our initial proposal to the Forest Service for the expedited Riperian (*sic*) Trade."




82. Fischer intentionally failed to disclose to Ricketts that Fischer and Schwab had already agreed on which lots to include in Riparian I based on their personal objectives.

83. Upon information and belief, The Point was selected for inclusion in Riparian I in order to offload a property that Defendants Schwab and Deadman Ranch, or their lenders and affiliates, had been saddled with for approximately 15 years, encumbered by debts they knew to be well in excess of its true market value.

84. The Defendants also selected Open Space North for inclusion in Riparian I. Upon information and belief, Defendant Schwab and Deadman Ranch (the owner of Open Space North) knew this lot had little true market value as it was subject to development restrictions. However, because it was the situs of sewer and water infrastructure for the subdivision, Defendants Schwab and Deadman Ranch knew that all other lots (and any other development plans) were dependent on continued access and use of Open Space North. Thus, Open Space North served as leverage for getting others to agree to the later transactions in Defendants Schwab and Fischer's scheme.

85. Defendants decided that Lots 22, 23, and 27 would not be included, but in order to keep Plaintiffs on the hook, they instead dangled options or promises of their inclusion in future transactions. Upon information and belief, Defendants Schwab, Deadman Ranch, and Fischer intentionally excluded these lots and others owned by Deadman Ranch from the Riparian I transaction in order to extract larger purchase prices in subsequent transactions, after Schwab had gotten his business partner in Greys River Meadows, Michael Call, "out of the way," and would not have to report the same to him.

86. When it came time to draft the transaction documents, Defendant Fischer had full authority to represent Plaintiffs' interests: he was the one and only point of contact with the lawyers and, in the scope of his agency, was empowered to make decisions on all deal points, supposedly in the interests of Plaintiffs.

87. Defendant Fischer repeatedly reassured Ricketts that he was overseeing all aspects of the transaction and had negotiated numerous provisions to protect the interests of Plaintiffs.

88. Unbeknownst to Plaintiffs, the actual negotiations behind the scenes were not as represented by Fischer.

89. Defendant Fischer rejected myriad suggestions to structure the transaction in a manner that better protected Plaintiffs. He dismissed concerns about the viability or wisdom of the deal terms he was dictating. None of these warnings or suggestions were communicated to Ricketts.

90. Defendants Fischer and Schwab were instead dictating terms that favored Schwab's interests and promoted their scheme to reap individual financial benefits. Plaintiffs have recently learned that when Fischer was dictating these contract terms to others, his comments were indicative of his true fealty to Schwab:

- "Dan [Schwab] has gotten us to the finish line as much as he possibly could," and Fischer directed that the terms needed to ensure that Plaintiffs were not "screwing Dan [Schwab]."
- In response to questions about the desired mechanics of a provision, Fischer responded, "Let me ask Dan as I am sitting with him now."
- In response to concerns about the wisdom of a provision he had dictated, Fischer stated, "this is all a gamble," and may result in "us [Ricketts] to potentially lose half our [Ricketts's] money… in either case, Dan [Schwab] only has to come up with half the money…"

91. Meanwhile, Fischer continued to make assurances to Ricketts that the transaction was appropriate for a land swap and that he had obtained preliminary approval for the same. These representations included the following on October 25, 2021: "My goal is to make the formal application with the Forest Service within two months of closing on the above-mentioned properties. I then believe it would be 6 months for me to receive on your behalf a permit to perform all of the necessary river restoration work that you desire to perform on the Upper Hoback River. My arrangement with the Forest Service would have the Land Trade fully consummated within 2 years of the formal application."

92. Upon information and belief, Fischer made these representations knowing of their falsity. Fischer did not have any "arrangement" with the Forest Service concerning a "Land Trade" for the Riparian Land, and even had a preliminary application been submitted, he knew or should have known that the timelines and feasibility were far different than what he had stated.

93. In the weeks leading up to the closing on the Riparian I, continuing through his presentation of the contract to Ricketts for signature, Defendant Fischer made representations that the contract contained the necessary provisions to protect Plaintiffs' interests. These representations included the following:

- "I have built contingencies into the contract so that if the land trade does not go through, and the Forest Service does not purchase the property from you…, then the properties will be repurchased by Dan [Schwab] at your election and you will be reimbursed your cash outlay as well as removed from the debt." (November 23, 2021).

- "This contract is extremely complicated as it contemplates many contingencies which I have negotiated to put you in the best financial position, if for some reason the trade is never consummated." (December 23, 2021).

94. Defendant Fischer knew each of these representations were false at the time they were made. Upon information and belief, Fischer, having just received a $100,000 bonus from Plaintiffs, knew that their trust and confidence in him was such that he could avoid close scrutiny of falsely represented contract terms.

95. Plaintiffs relied on and fully trusted these representations in deciding to sign the contract and close the Riparian I transaction.

96. In actuality, the "extremely complicated" contract contained provisions that were highly unfavorable to Plaintiffs, and/or could not be enforced in the manner Fischer had represented.

97. Upon information and belief, Defendants knew that the land being purchased for the exchange was materially less valuable, making a land swap with the Forest Service unlikely. They also knew that specific performance of the repurchase option was not legally enforceable. The inclusion of all the "contingencies" Fischer had supposedly negotiated for Ricketts's benefit were therefore all a ruse. The Defendants' true intent is revealed by a contingency they put in for their own benefit—one that purports to require that title in Lot 28 and Open Space North at Renegade revert to Deadman Ranch. Upon information and belief, Defendants' intent was to:

- reacquire control of the Renegade subdivision through ownership of Open Space North, a lot containing utilities and infrastructure relied upon by the subdivision;
- reassume the same overall amount of promissory note debt that existed prior to the transaction, except the debt would then all be consolidated under Deadman Ranch

(eliminating prior debts owed by Greys River Meadows, Schwab individually, and Schwab's personal business Terra West Conservancy);

- ensure they had fully and finally offloaded The Point to Plaintiffs for the astounding sum of $2.9 million (an amount now known to be <u>exponentially greater</u> its true market value); and
- pocket that $2.9 million without having to pay off any of their creditors.

98. On January 28, 2022, the Riparian I transaction closed.

99. At closing, $2,900,571.62 in cash was paid to Deadman Ranch via wire. Riparian Lands, LLC also assumed $3,499,428.38 in Schwab and the developers' (Deadman Ranch and Greys River Meadows) pre-existing debt via promissory notes which were personally guaranteed by Ricketts.

100. Upon information and belief, a portion of the proceeds from the cash paid at closing went directly to Defendants Schwab and Fischer.

## III. <u>The machinations and runup to the next transactions—the game is rigged; the price is set.</u>

101. On the same day that the Riparian I transaction closed, Greys River Meadows and Deadman Ranch, as then joint owners, quitclaimed all of their interests in the properties that would eventually become part of the Riparian II transaction over to Greys River Meadows alone—Dan Schwab signed on behalf of both entities. Upon information and belief, the effect of this was to exclude another owner of Deadman Ranch, Boyd Jacobson, from sharing in any profits from the Riparian II transaction, and to allow Defendants Schwab and Greys River Meadows to maximize their profits.

102. Selling the Riparian II properties at a grossly inflated price would also allow Defendant Schwab to get his disgruntled business partner in Greys River Meadows, Michael

Call, "off his back" and out of the picture, clearing the path for Defendants Schwab and Fischer to maximize their personal financial gains in the third and fourth Riparian Transactions.

103. Upon information and belief, Schwab needed to obtain $25 million on the Greys River Meadows lots to appease Call and secure his cooperation in the Riparian Transactions.

104. Upon information and belief, Defendants Schwab and Fischer therefore conspired to assign a value of $25 million to the Renegade lots owned by Greys River Meadows, while assigning a value of $30 million to the Renegade lots owned by Deadman Ranch (both those it had sold in Riparian I, as well as those it still owned).

105. They then embarked on a scheme to convince Plaintiffs to: (1) pay their fixed price of $55 million to $60 million for the remaining lots at Renegade; and (2) agree to purchase not just the Renegade lots owned by Greys River Meadows but also its other assets in Riparian II, per Michael Call's insistence.

*a.* *Defendant Fischer continues his fraudulent efforts to persuade Ricketts.*

106. Throughout the spring of 2022, Defendant Fischer's monthly reports to Plaintiffs repeatedly suggested that Plaintiffs should consider purchasing the remainder of Renegade as part of the land swap strategy and falsely represented on April 15, 2022 that, according to his contacts, Renegade is "the Forest Service's #1 most desirous property."

107. By June of 2022, Fischer was suggesting to Plaintiffs that it was in the interest of their land swap to purchase Michael Call's interest in Renegade for $25 million, and was previewing the other conditions Michael Call would require. At the conclusion of this pitch, in his June 2022 report transmitted on June 17, 2022, Fischer stated: "Additionally, because of Dan Schwab's partnership with Mike Call on his half of Renegade, Dan might be due approximately $2 million from this sale from Mike Call. Dan is more than willing to defer his payment from

Mike Call and effectively reduce the cash price of this purchase of half the Renegade by an additional $2M +/-."

108. Upon information and belief, Fischer, having just received another $100,000 bonus weeks earlier, was further emboldened and believed that his misrepresentations regarding deal points and pricing would avoid close scrutiny.

109. Upon information and belief, Defendant Fischer had begun exchanging drafts of the Riparian II contract before Plaintiffs had agreed to Fischer's pitch. Unbeknownst to Plaintiffs, no provisions were being negotiated as safeguards if the land swap did not go through. Fischer failed to disclose and/or actively concealed how the lack of these provisions in the contract would impact Plaintiffs' interests.

*b.* *Defendants retain another unqualified appraiser, feed him predetermined values, and direct him to value irrelevant properties to obfuscate the transaction.*

110. In the summer of 2022, around the time that he was making his sales pitch to Plaintiffs for the Riparian II transaction, Defendant Fischer retained Alex Moscinski to conduct additional appraisal work at Renegade. Moscinski was not qualified to conduct Yellow Book appraisals. He also lacked any experience conducting appraisals of the scope needed for Renegade, even on a Uniform Standards of Professional Appraisal Practice basis. Defendant Fischer was aware that Moscinski was not qualified to appraise real property to be used in a federal land exchange. In fact, Moscinski originally declined this appraisal engagement due to his lack of experience in the region, the uniqueness of the property, and the number of unknowns related to the property. Nonetheless, Fischer pressed forward with Moscinski. Upon information and belief, the retention of Moscinski by Fischer and Schwab was intentional and calculated, as they believed the young appraiser was one they could direct and control.

111. Although the purpose of Moscinski's appraisal should have been to determine fair market value of the Renegade lots owned by Greys River Meadows, LLC to be included in the Riparian II transaction, those were not the instructions Moscinski was given by Defendants Fischer and Schwab.

112. Instead, Defendants Fischer and Schwab directed Moscinski to appraise the entire Renegade subdivision, including lots already conveyed in Riparian I, as well as lots owned by third parties that were not to be any part of the subject transactions.

113. Upon information and belief, Defendants' direction to Moscinski to include the irrelevant lots in his appraisal was an intentional and calculated effort to make it very difficult to determine the value of any given lot.

114. Upon information and belief, the appraisal scope was also selected so that Defendants could maximize its uses on various fronts, including use for the next transactions in their scheme.

c. *<u>Defendants direct the appraiser to reach specific valuations.</u>*

115. Defendants Schwab and Fischer directed Moscinski to work backward from a specific value. Moscinski's work file contains the following note regarding a June 13, 2022 conversation with Fischer:


Intent is to $50-$60 million
point value several million

116. By the time of Moscinski's retention, the Riparian II contract was already being drafted. Call wanted $25 million for his lots, and Fischer had agreed to commit Ricketts to pay

that amount. Moscinski's work file also contains the following note from his July 8, 2022 site visit to Renegade with Dan Schwab:


25 mill upper 30 lower with 5 million bonus

Moscinski's work file notes from another conversation with Dan Schwab contain the following:


2.5million
Greys River 3 weeks
Backout - 55-60
25 mill upper -
30 mill w/o other lots - deadman

These notes indicate that Schwab and Fischer had dictated a $25 million value to Moscinski for the Greys River Meadows lots (that would be sold in the Riparian II transaction), and $30 million for the lots at Renegade that were owned by Deadman Ranch.

117. Upon information and belief, Moscinski was instructed to work backward from an overall value of $55-60 million ("Backout 55-60") for the entirety of Renegade. He had also been informed that there was an "agreed-upon value" for the Riparian II transaction lots prior to the appraisal being done.

118. Upon information and belief, Schwab provided the $25 million value allocation for Call's Greys River Meadows lots, and told the appraiser that the sale was to close in three weeks.

119. Upon information and belief, in early July 2022, Schwab provided the impressionable young appraiser, Moscinski, the same white glove treatment as he would have for a prospective purchaser—touring him around the property via ATV, showing him all the glossy

marketing materials, and telling him about the grand visions for the development as a luxury fly-in resort.

*d.* *Defendants feed the second appraiser false and misleading information.*

120. As with Smith, Schwab provided Moscinski with false and misleading information regarding prior sales.

121. Upon information and belief, on or about July 1, 2022, Schwab instructed Moscinski to disregard the prior lot transactions between $500,000 and $750,000 as they were not "part of" the luxury Renegade development, and to instead use Lots 2, 23 and 28 as comparables:



Same seler not part development
$500 - $750 not part of it
ones Sold - $3.2 - $2.85 for developed

122. As outlined above in the discussion of Smith's appraisal work, Lots 2 and 23 at Renegade were insider transactions where the stated "sales price" was not indicative of the amount of funds that had truly changed hands. Upon information and belief, Defendant Schwab also misrepresented them and/or concealed information in order to mislead Moscinski into believing they had purchase price values between $2.5 million and $3.2 million. For example, while providing the appraiser with the sale contract showing a $3.2 million sales price, Defendant Schwab did not provide Moscinski with a copy of the promissory note that comprised part of the 'sales price' of Lot 2 ("Lot 2 Note"). As a result, Moscinski was prevented from understanding that the terms of that promissory note were so unusual that it was an illusory promise of payment having little to no value. Additionally, for Lot 23, Moscinski's notes appear

to indicate that Schwab instructed him to utilize $2.5 million for the purchase price, and disregard the true nature of the transaction:




123. Lot 28 also did not constitute a proper comparable. It had just been purchased by Plaintiffs in the Riparian I transaction, where the sales price was derived from the fraudulently constructed Smith appraisal.

124. Moscinski's appraisal also relied on information that Schwab provided about listings, with Schwab falsely telling Moscinski that there had been a high-level of interest in recent listings.

125. Moscinski's appraisal report referenced listings of other properties in the vicinity, indicating that the appraiser had access to the MLS. However, numerous expired and unsuccessful listings of lots at Renegade and even Renegade in its entirety, were conspicuously absent from Moscinski's report.

126. In his valuation analysis, Moscinski also utilized the construction cost information and operational cost information Schwab outlined, but Schwab did not provide any of the underlying documents to Moscinski.

*e.* *The appraiser values the properties right at the targets Defendants had provided.*

127. On August 4, 2022, Moscinski issued his report valuing the entirety of the Renegade subdivision at $60.1 million—precisely on target with the value Fischer and Schwab had asked him to reach before Moscinski had begun any valuation work.

128. Unbeknownst to Plaintiffs, but knowable to Moscinski and known to Defendants Schwab and Deadman Ranch, Moscinski's appraisal was millions higher than the MLS listing for Renegade that had been taken down by Defendants just two months prior to Moscinski's appraisal site visit—after 334 days on the MLS.

129. On August 16, 2022, Moscinski issued an addendum, in which he stated, "I have been requested to separate out the previous determined values based on ownerships of the Subject property." Moscinski's addendum did not contain any additional valuation analysis; merely an opinion that the value of the Greys River Meadows lots was $29 million. Again, this result is directly in line with the pre-directed target Schwab and Fischer had given him.

*f.* *Fischer (again) withholds portions of the appraisal to mislead Plaintiffs.*

130. It was not until August 30, 2022, twenty days before the scheduled closing on Riparian II, that Fischer finally sent any information to Ricketts regarding the Moscinski appraisals. At that time, Fischer included only the two-page addendum to the Moscinski report with the conclusion that the Riparian II Lots have a 'market value' of $29 million. His transmission did not include the other one hundred and two pages of Moscinski's appraisal. In his monthly report attached to that email, Fischer had the following to say regarding the Moscinski appraisal: "the appraisal came in significantly higher than what it appears your overall costs will be, specifically the portion of the Renegade for the Greys River purchase which you are presently under contract to purchase for $24,250,000 has a current market value of $29 million."

131. Fischer had not previously informed Plaintiffs that Moscinski had been retained for the appraisals, presumably to avoid any questions or suspicions by Plaintiffs that might arise if there were conversations about Moscinski's lack of proper credentials to perform the requisite Yellow Book appraisals.

g. *Riparian II and III close at inflated prices.*

132. Fischer procured Ricketts's signature on the Riparian II contract on August 10, 2022. The contract contained no feasibility period and required the Plaintiffs to waive all property condition objections except those that were discovered upon review of the title commitments. Fischer had made assurances to Ricketts that he had thoroughly evaluated everything on his behalf, yet, upon information and belief, Fischer had failed to conduct basic due diligence or follow up on omissions in the seller's disclosures and deliverables. Upon information and belief, Fischer made no effort to negotiate any substantive provisions to protect the interests of Plaintiffs. Instead, as with Riparian I, Fischer intentionally, and in violation of his fiduciary duties, agreed to terms that provided greater protection and value to Defendants Schwab and Greys River Meadows.

133. On September 29, 2022, Fischer reported to Ricketts that ongoing meetings with the Forest Service have been going well, and that he has "met and gained the support of all the important players within the Forest Service." Again, these assurances were false and intended to give Plaintiffs the impression that all was well and that there was no need for Plaintiffs to inquire more or be concerned that their interests were not being served.

134. On September 6, 2022, the Riparian II transaction closed. The transaction involved the purchase of the following from Greys River Meadows: 11 lots at Renegade, various personal property belonging to the seller, and the Lot 2 Note. $24.25 million was paid in cash via wire by Riparian Lands II, LLC to Greys River Meadows. That purchase price was allocated as follows: $22.7 million to the real property, $350,000 to the personal property, and $1.2 million to the worthless Lot 2 Note.

135. On or about October 4, 2022, Riparian Lands III, LLC paid $2.55 million via wire to Burnham Holdings, LLC for Lot 23 at Renegade ("Riparian III").

136. Upon information and belief, Defendants Schwab, Greys River Meadows and Fischer set this purchase price based upon the fraudulent Smith appraisal. Among other things, the Smith appraisal had improperly used the prior insider "land exchange" between Schwab and Burnham, in which no money had changed hands but that had a stated "purchase price" of $2,622,457, as a comparable. Upon information and belief, Defendants Fischer and Schwab had procured the Smith appraisal on Lot 23 back in 2021 for the specific purpose of promising to obtain a set amount of money for Charles Burnham in consideration of various loans he had made to Schwab, Deadman Ranch and/or Greys River Meadows over the years.

137. Consistent with Fischer and Schwab's scheme, no provisions were included in the Riparian III contract in the event that a land swap with the Forest Service was not consummated.

138. In the fall of 2022, after Riparian II and III had closed, Fischer informed Ricketts that he was looking for different national appraisers to conduct the valuations of the Forest Service property Ricketts was hoping to acquire in the land swap.

139. Upon information and belief, Fischer used impressionable or biased appraisers for the Schwab-side transactions to artificially inflate the purchase prices to maximize financial benefit for Defendants and believed he could successfully misrepresent and conceal their nature and full content to Ricketts. However, Fischer knew that on the Forest Service-side of the transaction, the Forest Service would closely scrutinize any appraisals that were submitted on the federal lands Ricketts wanted to acquire. In short, Fischer knew that he could no longer use unqualified appraisers like Smith and Moscinski to perform the appraisals needed for the land swap.

140. In March or April of 2023, Fischer requested increased compensation beyond the $300,000/year he received from Hugo Enterprises. The request was declined.

141. In the middle of the Riparian Transactions, when Fischer was supposed to be representing Ricketts's interests in negotiations with Schwab, Fischer began accepting lavish gifts and favors from Schwab as both rewards and incentives to continue helping Schwab. Fischer enjoyed four to five trips with Schwab to Schwab's cabin on the Renegade, fishing and wilderness destinations, horseback riding destinations, and other unknown locations.

142. On or around April 5, 2021, Ricketts paid for Fischer to go to Key Largo, Florida to be Schwab's guest at a luxury resort.

143. Similarly, on or around June 10, 2023, Schwab paid for Fischer and his family to join Schwab on vacation. Fischer's wife posted photos from this vacation on social media.



*(June 10, 2023: Dan Schwab Left; Morgan and Dana Fischer Center)*

144. A few days later, Schwab sent his private plane to ferry Fischer's son from camp.



(June 13, 2023: Morgan Fischer Greeting His Son Arriving on Schwab Plane)

*h.* *Fischer pushes Ricketts to close the Riparian IV purchase.*

145. Unbeknownst to Plaintiffs, less than two weeks after the photographs above were taken, on June 26, 2023, Fischer received the first iteration of the contract for what would become the fourth Riparian transaction ("Riparian IV"). The contract had been drafted by Schwab's son, Mitchell Schwab. It called for a purchase price of $30 million—the exact figure Defendants Schwab and Fischer had directed appraiser Alex Moscinski to reach for the lots owned by Deadman Ranch.

146. At that time, Plaintiffs had not authorized Fischer to move forward with the transaction. Upon information and belief, Defendants Fischer and Schwab had conspired to forge ahead with the contract during their extravagant vacation together as a means to push Plaintiffs to agree to the transaction.

147. In July 2023, Fischer sent a number of emails to Ricketts again pushing for the final Renegade transaction. He represented that previously sold lots were now available for

purchase and stated that Schwab was asking to speak with Ricketts directly about "moving forward."

148. Fischer, however, did not disclose to Ricketts that negotiations of the Riparian IV transaction commenced months before Ricketts had formally decided to proceed with that transaction.

149. When the existence of a draft Riparian IV contract was finally disclosed to Ricketts, Fischer made reassurances that the transaction was being negotiated to protect Plaintiffs' interests, and that the overall purchase price that was being paid for all Renegade lots was below fair market value.

150. Fischer had made repeated representations to Ricketts that this final transaction would involve "the other half of Renegade" including the following from his July 27, 2022 monthly report to Ricketts: "once the Mike Call piece is under contract, I will work on a separate contract to purchase from Dan and his partner Boyd, the other half of Renegade." In actuality, the Riparian IV transaction involved only *three* of the twenty-one lots at Renegade, and only 18 acres out of the approximately 100 total acres in the subdivision.

151. Fischer did not order separate appraisals of the lots involved in the Riparian IV transaction. Instead, on September 4, 2023, Fischer emailed Ricketts the fraudulent July 2022 appraisal of the entire Renegade subdivision completed by Moscinski. In so doing, Fischer gave Ricketts the false impression that since Moscinski had valued the entire subdivision at $60.1 million, with the Greys River Meadows lots at $29 million, that the other "half" of Renegade owned by Deadman Ranch had a value of $31.1 million.

152. Fischer knew, however, that the Riparian IV transaction did not include the other "half" of Renegade, but only three of the twenty-one lots in Renegade.

153. The contract for the Riparian IV transaction, the purchase of Lots 9, 22, and 29 by Plaintiffs from Deadman Ranch, was signed on September 21, 2023, with a closing set for just a few weeks later.

154. Upon information and belief, this short timeline was a deliberate selection by the Defendants in order to preclude anyone from undertaking a close examination of the Moscinski appraisal or obtaining meaningful documents related to the actual status of development and construction from the County.

155. On October 10, 2023, Riparian Lands IV, LLC paid $24 million in cash via wire to Deadman Ranch, to close the Riparian IV transaction.

156. Incredibly, this price reflected a value of $1,324,387 per acre, over three times the per acre value of what Ricketts paid Call for similar land in the Riparian II transaction. However, Ricketts, assuming Fischer was acting in his best interests, completed this deal based on representations from Fischer that the price was supported by a qualified appraisal.

157. As part of Defendants Fischer and Schwab's scheme, no provisions were included in the agreement in the event that a land swap with the Forest Service was not consummated.

158. Upon information and belief, Defendants Schwab and Fischer both personally received some portion of the proceeds from the closing of the Riparian IV transaction.

**PLAINTIFFS' DISCOVERY OF DEFENDANTS' FRAUD**

159. Plaintiffs' acquisitions of the Riparian Land were based on Defendants' collective and separate representations that the land exchange strategy was viable and the valuations of the properties themselves were appropriate.

160. Plaintiffs have since learned that Defendants, collectively and separately had fraudulently misrepresented and concealed key facts about the property's true value in order to inflate the appraised values and advance their scheme to defraud Plaintiffs.

161. Recently, Plaintiffs learned in a meeting with Forest Service representatives that, contrary to Fischer's representations, the Forest Service was not interested in a land exchange for Renegade or The Point, stating that such an exchange was a "non-starter."

162. Following that meeting, consultants recommended to the Plaintiffs by the Forest Service representatives expressed concerns to Plaintiffs about the value Plaintiffs paid for the Riparian Land, implying that Plaintiffs had significantly overpaid for the Riparian Land and had possibly been the victim of fraud in doing so.

163. Joe Ricketts was dismayed to hear those concerns about the Riparian Transactions, the underlying value of the properties, and Fischer and Schwab's involvement. Ricketts retained an independent appraiser to re-appraise the Renegade and The Point properties. The independent appraiser was qualified to render Yellow Book Appraisals and had performed extensive appraisal work for the state and federal government.

164. The independent appraiser's findings were shocking. The appraiser found values for the Renegade properties involved in the Riparian Transactions to only be $21.9 million, and values for The Point properties involved in the Riparian Transactions to only be $171,000. These values differed drastically from the cumulative sale prices in the Riparian Transactions of $52.75 million for the Renegade properties and $2.9 million for The Point properties, resulting in a suspected net overpayment of over $33 million.

165. On or around July 16, 2024, Plaintiffs asked Fischer to review his communications with Schwab. Despite supposedly serving as Ricketts's agent and acting in Ricketts's best interests throughout this whole period, Fischer refused to allow Ricketts to review his text messages with Schwab.

166. Plaintiffs did not discover, and in the exercise of reasonable diligence could not have discovered, Defendants' fraud until recently, when Forest Service representatives informed Plaintiffs that a land exchange involving Renegade or The Point was not feasible, prompting the independent investigation and re-appraisal described above.

167. Plaintiffs' inability to discover the fraud sooner was the direct and intended result of Defendants' affirmative acts of concealment, including: Fischer's abuse of his position as Plaintiffs' trusted fiduciary and near-exclusive conduit of information concerning the Riparian Transactions; Fischer's transmission of curated, incomplete excerpts of the Smith and Moscinski appraisals; Fischer's suppression of Schrotz's adverse advice; Fischer's false reports of progress with, and "support" within, the Forest Service; and Defendants' compression of closing timelines to preclude scrutiny.

**CLAIM ONE**
**VIOLATION OF INTERSTATE LAND SALES FULL DISCLOSURE ACT (15 U.S.C. § 1703(a)(2))**
**(Defendants Fischer, Schwab, Deadman Ranch & Greys River Meadows)**

168. Plaintiffs incorporate and reallege all allegations above.

169. Defendants' actions are actionable as a violation of the anti-fraud provisions of the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1703(a)(2), pursuant to 15 U.S.C. § 1709.

170. The purpose and intent of the Interstate Land Sales Full Disclosure Act is to ensure that buyers, like Plaintiffs, are properly informed of facts that will enable them to make an informed decision about purchasing real estate property and prohibit developers or agents, like Defendants, from making material false statements or omissions about the development, like the parcels of land that comprised the Riparian Transactions.

171. Defendants were each participants in the sale or marketing of real property interests in the Riparian Land and communicated with Plaintiffs and with each other about the same by means of interstate commerce, including, at a minimum, between the states of Wyoming, New York, and Nebraska.

172. Defendants were all actively involved in the planning, subdividing, and/or promotion of the land represented in the Riparian Transactions.

173. The Riparian Land was land that was divided or proposed to be divided into lots for sale by Defendants meeting the meaning of a "subdivision" under 15 U.S.C. § 1701(3).

174. The Riparian Land represented lots marketed together for sale or lease by Schwab and/or Fischer and known, designated, or advertised as a common unit or by a common name (i.e. Renegade and The Point) and therefore meeting the meaning of a "common promotional plan" under 15 U.S.C. § 1701(4).

175. Defendants are developers and/or agents within the definition provided in 15 U.S.C. § 1701(5) & (6), as they directly or indirectly sold, offered to sell, and advertised for sale, or represented or acted on behalf of someone doing the same for the lots that comprised the Riparian Transactions and made direct and indirect use of communication in interstate commerce in the Riparian Transactions. At a minimum, Schwab and entities related to Schwab (including but not limited to Deadman Ranch and Greys River Meadows) sold the lots involved in the Riparian Transactions, and Fischer, while ostensibly being retained as an agent for Plaintiffs, in actuality worked on behalf of Schwab and entities related to Schwab to drive up the prices of the Riparian Land. Fischer directly and indirectly offered to sell and promoted the sale of the lots to Plaintiffs: he transmitted the sellers' pricing, marketing claims, and appraisals to Plaintiffs; he negotiated deal terms at the other Defendants' direction and in Defendants' interest, including

while "sitting with" Schwab; and he accepted gifts, travel, and, upon information and belief, undisclosed compensation from Schwab and the other Defendants in exchange for doing so. Fischer therefore represented and acted on behalf of the developer Defendants as their "agent" within the meaning of 15 U.S.C. § 1701(6), notwithstanding his ostensible retention by Plaintiffs.

176. Defendants, and the Riparian Transactions themselves, are not exempt from § 1702, both because neither of the transactions themselves fall into any of the defined exemptions of § 1702, and because Defendants' fraudulent actions were designed to evade requirements like those set out in the Interstate Land Sales Full Disclosure Act.

177. Plaintiffs allege that the Renegade subdivision contains and/or was approved to contain at least twenty-five lots as required by 15 U.S.C. § 1702(a)(1). No exemption under 15 U.S.C. § 1702(a) applies, and the partial exemptions of 15 U.S.C. § 1702(b) do not exempt any person from the anti-fraud provisions of 15 U.S.C. § 1703(a)(2). Hugo Enterprises and the Riparian Land Subsidiaries are "purchasers" within the meaning of 15 U.S.C. § 1701(10).

178. Plaintiffs also allege that the Renegade subdivision and The Point subdivision have existed under common ownership and have been put forward by Schwab as part of the same common promotional plan and should therefore be aggregated as a single subdivision for purposes of Plaintiffs' claim under the Interstate Land Sales Full Disclosure Act.

179. Via the schemes alleged above, Defendants have intentionally used interstate commerce and/or the mails to engage in activities prohibited by the Interstate Land Sales Full Disclosure Act, which include, but are not limited to:

(a) Employing a device, scheme, or artifice to defraud;

(b) Obtaining money by means of an untrue statement of a material fact, or by an omission to state a material fact necessary to the statements made (in light of the

circumstances in which they were made and within the context of the overall offer and sale or lease) not misleading, with respect to any information pertinent to the lot or subdivision; or

(c) Engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser.

180. To induce Plaintiffs to overpay for the Riparian Land by tens of millions of dollars, Defendants intentionally made numerous material misrepresentations or omissions, including, but not limited to:

(a) Misrepresenting or omitting Fischer and Schwab's pasts of legal misconduct and financial duress, including the judgments, foreclosure proceedings, and indebtedness described above;

(b) Misrepresenting or omitting information about the characteristics, use limitations or legal constraints on the Riparian Land;

(c) Misrepresenting or omitting the full substance and conclusions of the appraisals of The Point properties and the Renegade properties that supported the Riparian Transactions, including the extraordinary assumption that there was a bridge to The Point and year-round access to Renegade;

(d) Misrepresenting or omitting that these appraisals supported the prices Plaintiffs paid in the Riparian Transactions;

(e) Misrepresenting or omitting the objectivity and validity of those appraisals when in fact Fischer and Schwab had already agreed on inflated valuations for the properties included in appraisals and steered appraisers to arrive at those numbers;

(f) Misrepresenting or omitting the viability of Plaintiffs' planned land exchange strategy that undergirded the Riparian Transactions;

(g) Misrepresenting or omitting the feasibility of Plaintiffs unwinding the Riparian Transactions if Plaintiffs' planned land exchange strategy did not come to fruition.

181. Plaintiffs would not have entered into the Riparian Transactions at the prices that Plaintiffs paid for the Riparian Land but for the scheme to defraud, untrue statements and/or omissions, or overall fraud and deceit perpetrated against Plaintiffs as purchasers been enacted by Defendants.

182. In reliance on Defendants' misrepresentations and omissions, Plaintiffs overpaid for the Riparian Land by over $33 million. As a result, Plaintiffs have been injured and damaged by the actions of Fischer and Schwab.

183. As a direct and proximate result of Defendants' violation of 15 U.S.C. § 1703(a)(2), Plaintiffs are entitled to all relief and damages allowed under the Interstate Land Sales Full Disclosure Act which include, but are not necessarily limited to, damages as provided for in 15 U.S.C. § 1709, return of all funds paid under the Riparian Transactions contracts, return of the amounts that Defendants induced Plaintiffs to overpay for the Riparian Land, travel to and from the Riparian Land, appraiser fees, attorneys' fees and costs, expert fees and costs, interest as provided by law, and any other damages allowed at law or equity.

**CLAIM TWO**
**CIVIL RICO (18 U.S.C. § 1962(c))**
**(All Defendants)**

184. Plaintiffs incorporate and reallege all allegations above.

185. Defendants Fischer, Long Island Buyers Realty, Schwab, Deadman Ranch and Greys River Meadows formed an association-in-fact enterprise (the "Enterprise"). The Enterprise

possessed an ongoing organization and functioned as a continuing unit: Schwab and Fischer jointly directed its affairs; the entity Defendants supplied the land, contracts, marketing materials, and accounts through which the scheme operated; and the members' relationships—joint business ventures, gift and travel exchanges, and personal friendship—existed apart from the predicate acts themselves. Each Defendant is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c) that is distinct from the Enterprise.

186. As detailed above, Defendants associated together for the common purpose of: (a) misrepresenting the market value of the Riparian Land; (b) inducing Plaintiffs to purchase the Riparian Land at prices well in excess of fair market value; (c) concealing issues with the properties; (d) misrepresenting the suitability of the properties for particular uses; and (e) orchestrating the terms and sequencing of real estate transactions in a manner designed to strip purchasers of protection and remedies in the event their fraud and deceit was discovered—all for the purpose of their personal and financial gain.

187. Each Defendant conducted or participated in the conduct of the Enterprise's affairs as detailed above, including:

(a) Defendant Fischer agreed with the remaining Defendants to implement a scheme to defraud Plaintiffs in the Riparian Transactions. Defendant Fischer withheld material information from Plaintiffs despite owing them fiduciary duties. Defendant Fischer hired appraisers he knew were not qualified to conduct the necessary appraisals. On May 26, 2021, and August 30, 2022, Defendant Fischer submitted altered appraisals to Plaintiffs via email to hide Defendants' fraud and to induce Plaintiffs to overpay for the properties. Defendant Fischer sent multiple emails to Plaintiffs, including on April 26, 2021, May 21, 2021, October 21, 2021,

November 19, 2021, December 15, 2021, January 20, 2022, and May 13, 2022, making knowing misrepresentations to Plaintiffs to further Defendants' scheme. Defendant Fischer abused his position of trust and the resultant authority to enter into transactions on behalf of Plaintiffs to purchase the Riparian Land at substantially inflated prices.

(b) Defendant Schwab agreed with the remaining Defendants to implement a scheme to defraud Plaintiffs in the Riparian Transactions. Defendant Schwab identified and recommended unqualified and biased appraisers for Defendants to use to further their common scheme. Defendant Schwab provided the appraisers with fraudulent information and withheld material information from the appraisers. Defendant Schwab used his control of Deadman Ranch and Greys River Meadows to structure transactions to maximize his own personal financial gain. Defendant Schwab caused Deadman Ranch and Greys River Meadows to enter into contracts with Plaintiffs to sell property at fraudulently inflated value.

(c) Defendant Long Island Buyers Realty agreed with the remaining Defendants to implement a scheme to defraud Plaintiffs in the Riparian Transactions. Defendant Long Island Buyers Realty received payments and reimbursements from Plaintiffs for work performed by Fischer it knew was being done to benefit Defendants and to further Defendants' fraudulent scheme to the detriment of Plaintiffs.

(d) Defendant Deadman Ranch agreed with the remaining Defendants to implement a scheme to defraud Plaintiffs in the Riparian Transactions. Defendant Deadman Ranch entered into contracts with Plaintiffs to sell the Riparian Land at grossly inflated prices. On January 28, 2022, Defendant Deadman Ranch, along with

Defendant Greys River Meadows, quitclaimed all of their interests in the properties that would eventually become part of the Riparian II transaction over to Greys River Meadows alone to allow Defendants Schwab and Greys River Meadows to maximize profits. Defendant Deadman Ranch on or about January 28, 2022, received $2,801,068.60 from Plaintiffs via wire transfer it knew was derived from Defendants' fraud. Deadman Ranch participated in the operation and management of the Enterprise's affairs, including by supplying false comparables and concealing the insider nature of prior transactions, executing the quitclaim conveyances that sequenced the scheme, and dictating or influencing the structure, timing, and terms of the Riparian Land transactions.

(e) Defendant Greys River Meadows agreed with the remaining Defendants to implement a scheme to defraud Plaintiffs in the Riparian Transactions. Defendant Greys River Meadows entered into contracts with Plaintiffs to sell the Riparian Land at grossly inflated prices. On January 28, 2022, Defendant Greys River Meadows, along with Defendant Deadman Ranch, quitclaimed all of their interests in the properties that would eventually become part of the Riparian II transaction over to Greys River Meadows alone to allow Defendants Schwab and Greys River Meadows to maximize their unlawful profits at the expense of other owners in Deadman Ranch. On September 6, 2022, Defendant Greys River Meadows received $24,140,853.92 from Plaintiffs via wire transfer it knew was derived from Defendants' fraud. Greys River Meadows participated in the operation and management of the Enterprise's affairs, including by consolidating

title to the Riparian II lots through the January 28, 2022 quitclaim conveyance, and dictating the structure, timing, and terms of the Riparian II contract.

188. Each Defendant participated, directly or indirectly, in the Enterprise's affairs through commission of at least two predicate acts, including wire fraud, and interstate travel in aid of racketeering enterprise. These acts are detailed above, and include but are not limited to:

(a) Transmitting fraudulently constructed appraisals via electronic mail on or around May 26, 2021, August 25, 2022, September 4, 2023 and September 12, 2023;

(b) Emailing fraudulent information to Ricketts on or about April 26, 2021, May 21, 2021, July 27, 2021, October 21, 2021, November 19, 2021, December 15, 2021, January 20, 2022 and May 13, 2022;

(c) Using wires to receive the proceeds of their fraudulent conduct on or about January 21, 2022, January 26, 2022, August 11, 2022, September 2, 2022, September 14, 2022, September 22, 2023, September 29, 2022, and October 9, 2023;

(d) Upon information and belief, wiring fraudulently obtained proceeds, or kickbacks, to various participants in the Riparian Transactions.

189. Defendants' predicate acts occurred over the course of at least three years (2020 to 2023), were related, continuous, and shared the same purpose. Thus, Defendants' conduct constitutes a pattern of racketeering activity under 18 U.S.C. § 1961(5) and satisfies the continuity-plus-relationship test.

190. Defendants' racketeering activity also posed a threat of continuing into the future and was, for Schwab, a regular way of conducting his ongoing real estate business. Before targeting Plaintiffs, Schwab had marketed the Subdivisions to other prospective purchasers using

the same misrepresented insider "sale prices," and, upon information and belief, had previously used appraiser Smith to generate result-driven valuations to assure lenders and business partners. Nor were Plaintiffs the scheme's only victims or targets: Defendants' conduct was designed to deceive and injure, among others, other members of the entity Defendants who were cut out of transaction proceeds; lenders and business partners whose debts were extinguished with the proceeds of the fraud; and, ultimately, the Forest Service, which Defendants intended to induce into a federal land exchange premised on the same inflated valuations. Had the scheme not been discovered, Defendants stood ready to employ the same methods—rigged appraisals, concealed insider pricing, and captive intermediaries—in sales of the remaining Renegade lots to other purchasers.

191. As a direct and proximate result of Defendants' racketeering activities, Plaintiffs suffered financial losses in an amount to be proven at trial.

192. Plaintiffs have standing under 18 U.S.C. § 1964(c) and are entitled to treble damages, costs, and attorneys' fees.

**CLAIM THREE**
**<u>RICO CONSPIRACY (18 U.S.C. § 1962(d))</u>**
**(All Defendants)**

193. Plaintiffs incorporate and reallege all allegations above.

194. As detailed above, each Defendant knowingly agreed with one or more of the other Defendants to conduct or participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d). The existence and terms of that agreement are evidenced by, among other things, Defendants' agreement on purchase prices before any appraisal had been performed, their coordinated selection and direction of appraisers Smith and Moscinski, their coordinated sequencing and structuring of the four Riparian Transactions, and their division of the proceeds.

195. Each Defendant knew of and agreed to facilitate the scheme's objectives and agreed that one or more members of the conspiracy would commit at least two predicate acts of racketeering, including the acts of wire fraud and interstate travel in aid of racketeering described above.

196. As a direct and proximate result of Defendants' conspiracy, Plaintiffs were injured in their business and property as described above and are entitled to treble damages, costs, and attorneys' fees under 18 U.S.C. § 1964(c).

**CLAIM FOUR**
**BREACH OF FIDUCIARY DUTY**
**(Defendant Fischer)**

197. Plaintiffs incorporate and reallege all allegations above.

198. Fischer was an agent of Plaintiffs, having been cloaked with authority to act on their behalf in the transactions at issue.

199. A special relationship also existed between Fischer and Plaintiffs which created a relation of trust and confidence between the parties and resulted in the creation of extra-contractual duties owed by Fischer. Over the years, Fischer had gained the confidence of Plaintiffs and had been acting and advising in various matters ostensibly for the protection of Plaintiffs' interests.

200. By virtue of this agency or special relationship, Fischer had a duty to act primarily for Plaintiffs' benefit in the land swap negotiations and Riparian Transactions.

201. All of Defendant Fischer's actions relevant to the Riparian Transactions were conducted within the course of his agency and fiduciary duties. Fischer breached his duties to Plaintiffs by acting in a manner contrary to their interests; acting instead for his own interests and those of his co-conspirator, Schwab.

202. Defendant Fischer's breaches include: (a) materially misrepresenting or concealing facts regarding the nature, use, and value of the Riparian Land that he had a duty to truthfully and fully convey to Plaintiffs; (b) hiring unqualified appraisers; (c) instructing appraisers to set values for the property known to be in excess of fair market value; (d) selectively sharing appraisals with Plaintiffs; (e) negotiating and accepting transaction terms that were contrary to Plaintiffs' interests; and (f) failing to convey advice of other consultants to Plaintiffs that he had a duty to truthfully and fully convey to Plaintiffs.

203. As a result of Fischer's breach of his fiduciary duties, Plaintiffs were directly and proximately damaged in an amount to be proven at trial but no less than $33,579,000 in overpayment for the Riparian Land.

204. Plaintiffs also seek punitive damages stemming from this claim to punish Fischer and to deter others from similar conduct, all such other equitable relief as may be appropriate, and the recovery of Plaintiffs' attorneys' fees and costs.

**CLAIM FIVE**
**FRAUDULENT INDUCEMENT**
**(All Defendants)**

205. Plaintiffs incorporate and reallege all allegations above.

206. Plaintiffs allege a Wyoming state law claim for fraudulent inducement against Defendants Fischer, Long Island Buyers Realty, and Schwab, and against Defendants Deadman Ranch and Greys River Meadows, each of which is liable for the acts of its manager and agent, Schwab, taken within the scope of his actual or apparent authority.

207. Defendants secretly agreed among themselves, and perhaps with others, to deprive Plaintiffs of fair consideration in exchange for the Riparian Land and instead sought to induce Plaintiffs to drastically overpay for the Riparian Land.

208. Defendants intended to induce Plaintiffs to enter into agreements for the Riparian Land, knowing that the property was not worth the price that Plaintiffs were induced to pay.

209. The secret agreements were entered into prior to or contemporaneous with the negotiation or execution of the Riparian Transactions.

210. The secret agreements were not disclosed to Plaintiffs, and Plaintiffs believed in good faith that Defendants had not entered into such a conspiracy or an agreement to deprive Plaintiffs of their rights and monies under the Riparian Transactions.

211. In furtherance of the secret agreements, information underlying the Riparian Transactions, including, but not limited to, appropriate fair value for the Riparian Land, prior appraisals, prior failed listings, prior sales prices and transaction details, restrictions on uses of the properties, viability of the land exchange strategy and prior USFS communications and valuations related to the same, and the interconnected personal and financial relationships of Defendants and others involved in the sales of the Riparian Land were not provided to Plaintiffs. Defendants hoped to deprive Plaintiffs of this information in order to induce Plaintiffs to enter into the Riparian Transactions and Defendants' preferred price points.

212. The foregoing include, but are not limited to, the following: Fischer withheld and failed to disclose large portions of the appraisals of the properties when transmitting them to Ricketts, and failed to disclose known information about Schwab's prior felony conviction. Schwab failed to disclose insider transaction details to appraisers for the purpose of skewing and concealing the true value of the Riparian Land from Plaintiffs, failed to disclose the previous valuation of The Point by the Forest Service, and failed to disclose various failed listings of the Riparian Land at prices lower than those he was attempting to extract from Plaintiffs. Each of

Fischer and Schwab is additionally liable for the nondisclosures and concealments of the other as a co-conspirator and joint tortfeasor.

213. The conduct of Defendants was intentional, malicious, and aimed at deceiving Plaintiffs and preventing them from learning the true state of facts. The conduct was further intended to induce Plaintiffs to enter into the Riparian Transactions.

214. Plaintiffs relied upon the Defendants' conduct to their detriment when they entered into the Riparian Transactions, and they would not have entered into the agreements had they known the true state of facts.

215. Each element of the fraudulent inducement claim averred to herein may be inferred from direct or circumstantial evidence adduced at trial.

216. As a direct and proximate result of this fraudulent conduct by Defendants, Plaintiffs suffered injuries and are entitled to an award of damages against Defendants in an amount to be proven at trial but no less than $33,579,000 in overpayment for the Riparian Land.

217. Plaintiffs also seek punitive damages stemming from this claim to punish Defendants and to deter others from similar conduct, all such other equitable relief as may be appropriate, and the recovery of Plaintiffs' attorneys' fees and costs.

## CLAIM SIX
## FRAUDULENT MISREPRESENTATION
**(Defendants Fischer and Schwab)**

218. Plaintiffs incorporate and reallege all allegations above.

219. Defendants intentionally and fraudulently made material misrepresentations to Plaintiffs, knowing them to be false. These material misrepresentations include, but are not limited to, the following misstatement or misleading of material facts:

(a) Misrepresenting Fischer and Schwab's pasts of legal misconduct and financial duress, including the judgments, foreclosure proceedings, and indebtedness described above;

(b) Misrepresenting the full substance and conclusions of the appraisals of The Point properties and the Renegade properties that supported the Riparian Transactions, including the extraordinary assumption that there was a bridge to The Point and year-round access to Renegade;

(c) Misrepresenting that these appraisals supported the prices Plaintiffs paid in the Riparian Transactions;

(d) Misrepresenting the objectivity and validity of those appraisals when in fact Fischer and Schwab had already agreed on valuations for the property included in Moscinski's appraisals and steered Moscinski to arrive at those numbers in completing his appraisal work;

(e) Misrepresenting, causing Plaintiffs' retained appraisers to misrepresent, and/or causing the sellers of the Riparian Land to misrepresent the true value of the land that comprised the Riparian Transactions;

(f) Misrepresenting the viability of Plaintiffs' planned land exchange strategy that undergirded the Riparian Transactions; and

(g) Misrepresenting the feasibility of Plaintiffs unwinding the Riparian Transactions if Plaintiffs' planned land exchange strategy did not come to fruition.

220. Specifically: Fischer made each of the written misrepresentations quoted or described above, including in his December 12, 2020, May 26, 2021, October 25, 2021, November 23, 2021, December 23, 2021, April 15, 2022, June 17, 2022, August 30, 2022, and

September 4, 2023 emails and reports to Ricketts. Schwab made the misrepresentations described above to appraisers Smith and Moscinski—including false "sale prices" for Lots 2 and 23, false construction and operating cost figures, and false statements regarding listings and market interest—intending and expecting that those misrepresentations would be incorporated into appraisals delivered to and relied upon by Plaintiffs, and they were. Each of Fischer and Schwab is additionally liable for the misrepresentations of the other as a co-conspirator and joint tortfeasor.

221. At the time the misrepresentations and omissions specified above were made, Defendants knew the representations of fact to be false and that their failure to disclose material facts created a false impression as to the true state of the circumstances surrounding the Riparian Transactions, inducing Plaintiffs to purchase the property at an inflated value and rendering them unable to pursue their land exchange strategy.

222. Plaintiffs reasonably believed and relied upon the truth of Defendants' statements regarding the Riparian Land and relied upon the misrepresentations made by Defendants in deciding to purchase the Riparian Land and pursue the land exchange strategy.

223. Plaintiffs were uninformed of the falsity of these representations by Defendants, and Plaintiffs' reliance thereon was reasonable under the circumstances. Plaintiffs' reliance was justifiable in light of Fischer's years of apparently faithful service, his fiduciary position and role as Plaintiffs' near-exclusive source of information concerning the Riparian Transactions, and Defendants' deliberate concealment of the appraisals' assumptions, scope, and limiting directives.

224. But for the fraudulent misrepresentations of Defendants, Plaintiffs would not have consummated the purchases of the Riparian Land at the prices that they did, and they would not have expended considerable resources to carry out the land exchange strategy.

225. Each element of the fraudulent misrepresentation claim averred to herein may be inferred from direct or circumstantial evidence adduced at trial.

226. As a direct and proximate result of the fraudulent conduct by Defendants, Plaintiffs suffered injuries and are entitled to an award of damages against Defendants in an amount to be proven at trial but no less than $33,579,000 in overpayment for the Riparian Land.

227. Upon information and belief, Defendants acted with an evil mind by breaching their contractual and/or fiduciary duties to Plaintiffs and by knowingly pursuing a course of fraudulent conduct which caused significant harm to the economic interests of Plaintiffs by defrauding Plaintiffs.

228. Plaintiffs also seek punitive damages stemming from this claim to punish Defendants and to deter others from similar conduct, all such other equitable relief as may be appropriate, and the recovery of Plaintiffs' attorneys' fees and costs.

**CLAIM SEVEN**
**CIVIL CONSPIRACY**
**(All Defendants)**

229. Plaintiffs incorporate and reallege all allegations above.

230. Plaintiffs allege a Wyoming state law claim for civil conspiracy against Defendants.

231. Defendants set out to ensure that Plaintiffs overpaid for the Riparian Land in an effort to enrich themselves, and their associates, colleagues, or friends at Plaintiffs' expense.

232. Defendants also set out to ensure that Plaintiffs followed through on the Riparian Transactions and convinced Plaintiffs that completing these transactions would result in a successful land exchange strategy.

233. Defendants had a meeting of the minds, were in agreement, and were in discussion about this scheme from before the first Riparian Transaction was entered into through the completion of the final Riparian Transaction.

234. Defendants committed the overt unlawful acts set forth above to achieve their objectives and in furtherance of their scheme.

235. Each element of the civil conspiracy claim averred to herein may be inferred from direct or circumstantial evidence adduced at trial.

236. All of Defendants' conspiratorial actions have been willful and have damaged Plaintiffs in the amount of at least $33,579,000 in overpayment for the Riparian Land.

237. Plaintiffs also seek punitive damages stemming from this claim to punish Defendants and to deter others from similar conduct, all such other equitable relief as may be appropriate, and the recovery of Plaintiffs' attorneys' fees and costs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court issue a final judgment for the Plaintiffs and against the Defendants with the following relief:

(a) For damages in an amount to be proven at trial but no less than $33,579,000;

(b) For all other relief provided by 15 U.S.C. § 1709;

(c) For treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c);

(d) For general damages for the loss of business opportunity in an amount to be proven at trial;

(e) For repayment of all fees, expenses, reimbursements, or other monies paid by Plaintiffs to Fischer in accordance with the terms of the parties' consulting agreement;

(f) Punitive damages in an amount to deter Defendants and other similarly situated individuals and entities from engaging in such conduct;

(g) Pre- and post-judgment interest, if appropriate, at the highest legal rate, until paid;

(h) Appraiser fees;

(i) Travel to and from the Riparian Land;

(j) Expert fees and costs;

(k) For Plaintiffs' reasonable costs and attorneys' fees as provided by law; and

(l) Granting all other relief available, just, proper and permitted under the applicable law and in equity as the Court may deem appropriate.

Plaintiffs demand trial by jury on all issues.

Dated: September 14, 2026

Respectfully submitted,

*/s/ January D. Allen*

January D. Allen (7-5723)
Daniel M. Reilly (*pro hac vice forthcoming*)
John M. McHugh (*pro hac vice forthcoming*)
Amy L. Jones (*pro hac vice forthcoming*)
FENNEMORE CRAIG, P.C.
3615 Delgany Street, Suite 1100
Denver, Colorado 80216
Telephone: (303) 291-3200
Facsimile: (303) 291-3201
jallen@fennemorelaw.com
dreilly@fennemorelaw.com
jmchugh@fennemorelaw.com
ajones@fennemorelaw.com

*Attorneys for Plaintiffs*